IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ROBERT TRAVIS JENKINS,

                Petitioner,

    v.                                                CASE NO. 25-3076-JWL

DAN SCHNURR,

                Respondent.

## MEMORANDUM AND ORDER

This matter is a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by Petitioner and Kansas state prisoner Robert Travis Jenkins, who is currently incarcerated at Hutchinson Correctional Facility in Hutchinson, Kansas. The parties have submitted extensive briefing on the threshold issues of whether the petition was timely filed and whether an exception to the statute of limitations should apply. The Court has carefully reviewed all of the parties' arguments, the state-court records, and the relevant law. For the reasons set forth below, the Court concludes that this matter must be dismissed because it was not timely filed and Petitioner has not made the showing required for the Court to allow him to proceed despite his untimely filing.

### Background

A more detailed recitation of the procedural history that led to this federal habeas case is set forth in the Court's notice and order to show cause ("NOSC") issued on May 14, 2025 (Doc. 3) and need not be repeated here. As relevant to the timeliness issue the Court now decides, it is sufficient to say that in 2016, a jury in Seward County, Kansas convicted Petitioner of aggravated robbery and the district court sentenced him to 221 months in prison. (*See* Doc. 3, p. 1.) Petitioner pursued an ultimately unsuccessful direct appeal, which became final when the United States

Supreme Court denied his petition for review on October 7, 2019. On November 30, 2021, Petitioner filed in Seward County district court a motion seeking state habeas corpus relief under K.S.A. 60-1507, which the district court denied as untimely. *See id.* at 2. Petitioner appealed and, in December 2023, the KCOA reversed the denial and remanded for further proceedings, which as of the date of this order appear to be ongoing. *Id.*; *See Jenkins v. State*, Seward County Case No. 2021-CV-000085, available at http://casesearch.kscourts.gov.

In April 2025, Petitioner filed the pro se petition for federal writ of habeas corpus pursuant to 28 U.S.C. § 2254 that began the case now before this Court. (Doc. 1.) After Petitioner paid the required filing fee, the Court conducted the initial review required by Rule 4 of the Rules Governing § 2254 Cases in the United States District Courts. On May 14, 2025, this Court issued the NOSC mentioned above, explaining that this action is subject to the one-year limitation period established by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") in 28 U.S.C. § 2244(d). (Doc. 3, p. 2-3.) The NOSC further explained that under the controlling caselaw, the final day for Petitioner to timely file his § 2254 petition in this Court was October 8, 2020 and Petitioner was not entitled to statutory tolling of the AEDPA statute of limitations under 28 U.S.C. § 2244(d)(2) because his K.S.A. 60-1507 motion was not filed until November 2021. *Id.* at 3-4. Thus, because Petitioner did not file his § 2254 petition until April 2025, the petition was not timely filed. *Id.* at 3-4.

The NOSC noted, however, that the AEDPA statute of limitations may be equitably tolled—or paused—"'in rare and exceptional circumstances.'" *Id.* at 4 (quoting *Gibson v. Klinger*, 232 F.3d 799, 808 (10th Cir. 2000)). Additionally, "[a]n exception to the AEDPA statute of limitations exists where a petitioner adequately asserts actual innocence." *Id.* at 6. The NOSC explained the circumstances under which equitable tolling is appropriate and under which the

2

actual innocence exception applies and it granted Petitioner time in which to show cause why this matter should not be dismissed as time-barred. *Id.* at 4-7.

Petitioner submitted his response (Doc. 21) on July 22, 2025. After reviewing the response, the Court concluded that a limited Pre-Answer Response ("PAR") was appropriate, so it ordered Respondent to file a PAR limited to addressing the affirmative defense of timeliness. (Doc. 22.) Respondent timely filed the PAR on October 21, 2025. (Doc. 28.) Petitioner timely filed his reply on December 1, 2025. (Doc. 33.) Petitioner has submitted additional filings, which are addressed below.

The Court reviewed the parties' arguments and, on December 3, 2025, issued a memorandum and order noting that "Petitioner does not dispute that his petition was filed outside of the statute of limitations." (Doc. 34, p. 2.) Rather, Petitioner asserted that he was entitled to equitable tolling and, in the alternative, that he qualified for the actual innocence exception. (Doc. 34, p. 2.) In order to resolve the question of whether equitable tolling or application of the actual innocence exception is appropriate in this case, the Court needed additional state court records. *Id.* at 3. Therefore, it ordered Respondent to provide those records to the Court, which Respondent promptly did. (Doc. 35.)

## The Filings Considered by the Court

The Court pauses to clarify which documents filed in this matter it has considered in its analysis of whether the petition in this matter was timely filed. Since the Court issued the NOSC on May 14, 2025, Petitioner has filed 10 separate documents[1] with this Court that contain at least some argument regarding timeliness. (Docs. 13, 15, 16, 17, 18, 19, 21, 23, 33, 26, and 37.) In total,

---

[1] One of the documents filed by Petitioner in this matter contained both a response to the NOSC and motions asking the Court to take additional actions. Thus, the clerk filed the document twice—once as a response (Doc. 17) and once as a motion (Doc. 18)—due to the requirements of the Court's filing system.

these documents, which are somewhat duplicative and which also contain argument and assertions unrelated to timeliness, consist of more than 130 pages. The Court has expended considerable time and effort reviewing them and liberally construing them to ensure that Petitioner's arguments are thoroughly considered, despite his ongoing failure to comply with the Court's orders to limit his filings. Petitioner is assured that although this order does not specifically address every point he has made regarding equitable tolling and the actual innocence exception, the Court considered each of his arguments before reaching any conclusions in this matter.

## Analysis

As stated above and in the December 3, 2025 M&O, Petitioner does not dispute the Court's conclusion that his federal habeas petition was not timely filed. Nor does he contend that he is entitled to statutory tolling of the AEDPA limitations period. Instead, Petitioner focuses on equitable tolling and the actual innocence exception. The Court will address each in turn.

### *Equitable Tolling*

As explained in the NOSC:

> The federal habeas one-year limitation period is subject to equitable tolling "in rare and exceptional circumstances." *Gibson v. Klinger*, 232 F.3d 799, 808 (10th Cir. 2000) (citation omitted). Equitable tolling is available only "when an inmate diligently pursues his claims and demonstrates that the failure to timely file was caused by extraordinary circumstances beyond his control." *Marsh v. Soares*, 223 F.3d 127, 1220 (10th Cir. 2000). Circumstances that warrant equitable tolling include, "for example, when a prisoner is actually innocent, when an adversary's conduct—or other uncontrollable circumstances—prevents a prisoner from timely filing, or when a prisoner actively pursues judicial remedies but files a deficient pleading during the statutory period." *Gibson*, 232 F.3d at 808 (internal citations omitted).

(Doc. 3, p. 4-5.)

When considering equitable tolling, the Court initially focuses on the time period during which the federal habeas limitation period was running, which in this case was from October 8,

2019 through October 8, 2020. If no equitable tolling is warranted during that time, the analysis ends. On the other hand, if equitable tolling of any portion of that year is warranted, that equitable tolling, practically speaking, will extend the AEDPA statute of limitations.

First, some of Petitioner's arguments appear to be based on the state law standards for allowing untimely motions under K.S.A. 60-1507. For example, Petitioner argues that this Court may disregard the untimeliness of his federal habeas petition if presented with "clear proof of manifest injustice" and if the petition and "the face of the record" allege "matters shocking to the conscience." (Doc. 21, p. 2.) Under K.S.A. 60-1507(f)(2), the time limitation for filing a K.S.A. 60-1507 motion "may be extended by the court only to prevent a manifest injustice" and the KSC in the past has "described manifest injustice as something '"obviously unfair" or "shocking to the conscience."'" *Skaggs v. State*, 59 Kan. App. 2d 121, 132 (2020) (quoting *State v. Holt*, 298 Kan. 469, 480 (2013)). The standards for overcoming a time-bar imposed under the federal AEDPA statute of limitations, as set out in the NOSC, are different. Thus, Petitioner's arguments about manifest injustice and matters shocking to the conscience are not persuasive here. (*See* Doc. 21, p. 2-5.) To the extent that they may be liberally construed to support an argument for equitable tolling or the actual innocence exception, the Court has done so.[2]

Petitioner also asserts that the Court should equitably toll the AEDPA statute of limitations because counsel appointed to represent him in state-court appellate proceedings led him to believe that the one-year AEDPA statute of limitations would not start until his K.S.A. 60-1507 proceeding

---

[2] Petitioner argues at length that his constitutional rights were violated during his trial and his direct appeal. (Doc. 21, p. 2-6; Doc. 23, p. 8-21; Doc. 33; Doc. 37, p. 2.) But when determining whether to equitably toll the federal habeas statute of limitations, this Court does not look at such errors. It looks at circumstances that occurred during the time when the federal habeas statute of limitations was running. As explained in the NOSC, the one-year federal habeas statute of limitations "began to run" on October 8, 2019, after Petitioner's trial and direct appeal concluded. (Doc. 3, p. 3.) Thus, generally speaking, trial and direct-appeal errors are not relevant to equitable tolling, nor is the fact that Petitioner's father filed suit under 42 U.S.C. § 1983 in the United States District Court for the District of Columbia in October 2017. (*See* Doc. 21-1, p. 2, 14.) Similarly, the exhibits Petitioner has provided that reflect he attempted to file a K.S.A. 60-1507 motion in 2017 are not material to equitable tolling. (*See* Doc. 25, p. 1-2.)

is final. (Doc. 19, p. 2-3.) In support, Petitioner has submitted a March 1, 2019 letter to him from direct-appeal counsel that states: "After the entire state direct appeal and post-conviction processes are complete, you can file what is called a 'federal habeas corpus' proceeding. The petition for habeas relief must be filed within a year from the date the post-conviction relief was denied. 28 [U.S.C.] § 2255(f); 28 U.S.C. § 2244(d)(2)." (Doc. 19-6, p. 2.)

Clearly, the information counsel provided to Petitioner was not entirely accurate. Professional misconduct or "egregious behavior" by an attorney may constitute an extraordinary circumstance that warrants equitable tolling. *See Holland v. Florida*, 560 U.S. 631, 651 (2010). But an attorney's "[s]imple excusable neglect is not sufficient" to do so. *See Gibson*, 232 F.3d at 808 (citation omitted). One panel of the Tenth Circuit explained it this way:

> Equitable tolling may be applied when the attorney misrepresents a filing deadline in a particularly egregious way, *see United States v. Martin,* 408 F.3d 1089, 1094-95 (8th Cir.2005) (holding that equitable tolling applied when the attorney informed his client there was no such thing as a one-year filing deadline and consistently lied to his client and the client's wife), or deliberately hides information from his client in order to cover up his misdeeds, *see Fleming* [*v. Evans*]*,* 481 F.3d [1249,] 1255-57 [(10th Cir. 2007)] (holding that petitioner was entitled to equitable tolling where former counsel actively deceived petitioner over several months into believing he was diligently pursuing petitioner's legal remedies when, in fact, he was not). But a miscalculation or misinterpretation of the statutory provision regarding the limitation period, with nothing more, does not rise to the level of misconduct that would justify equitable tolling. *See Lawrence v. Florida,* 549 U.S. 327, 336-37 (2007) ("Lawrence argues that his counsel's mistake in miscalculating the limitations period entitles him to equitable tolling. If credited, this argument would essentially equitably toll limitations periods for every person whose attorney missed a deadline."); *Rouse v. Lee,* 339 F.3d 238, 248-49 (4th Cir.2003) (holding that "a mistake by a party's counsel in interpreting a statute of limitations does not present the extraordinary circumstance beyond the party's control where equity should step in to give the party the benefit of his erroneous understanding" and noting "[a] majority of other circuits agree," citing cases from the Second, Third, Fifth, Seventh, Eighth, Ninth, Eleventh, and Federal Circuits).

*Dominguez v. Hatch,* 440 Fed. Appx. 624, 626 (10th Cir. Sep. 23, 2011) (unpublished)

In other words, even though Petitioner's frustration that counsel gave him information that

was not entirely accurate is understandable, "[a]ttorney miscalculation is simply not sufficient to warrant equitable tolling, particularly in the postconviction context where prisoners have no constitutional right to counsel." *See Lawrence*, 549 U.S. at 336. Even when Petitioner's allegations are liberally construed, they do not show the type of egregious behavior by an attorney that justifies equitable tolling of the federal habeas statute of limitations. *Contrast Holland*, 560 U.S. at 652 (finding equitable tolling warranted where counsel "failed to file [the] federal petition on time despite . . . many letters [from the client] that repeatedly emphasized the importance of his doing so"; counsel failed to research the required filing date despite the client letters that identified the applicable legal rules; counsel failed to inform the client in a timely manner about the resolution of his state court proceedings; and counsel "failed to communicate with his client over a period of years, despite various pleas from [the client] that [counsel] respond to his letters").

Petitioner also argues that the AEDPA statute of limitations should be equitably tolled based on his "multiple" attempts in January, February, and March 2020 to file a K.S.A. 60-1507 motion. He alleges that a state district court clerk refused to file the motions, saying that the documents "were not correct" even though Petitioner had used the standard form, and he contends that the clerk should have filed the motion and left any deficiencies to be dealt with by the court. (Doc. 21, p. 1; Doc. 36.) More specifically, Petitioner asserts that he mailed a K.S.A. 60-1507 motion to the Seward County District Court on January 24, 2020; in support, he refers the Court to "Attachment A." (Doc. 37, p. 1.) But Attachment A is a letter dated October 16, 2017, in which the Chief Judge of the Butler County District Court informs Petitioner that a K.S.A. 60-1507 motion such as the one he submitted[3] for filing "is to be filed in the court which imposed the

---

[3] The Court notes that the 2017 attempt at filing a K.S.A. 60-1507 was procedurally improper, since at that time, Petitioner's direct appeal was pending. *See Baker v. State*, 297 Kan. 486, 490 (2013) ("We have explicitly stated that Rule 183 prohibits simultaneous pursuit of a direct appeal and a motion under K.S.A. 60-1507. [Citation omitted.]").

7

sentence, in this instance, Seward County." (Doc. 37-1.) This 2017 letter does not support Petitioner's claim that he tried to file a K.S.A. 60-1507 motion in 2020.

Petitioner also has submitted a document titled "Legal Postage Reversal" that shows he incurred a charge for postage on January 24, 2020 for a mailing to a "Civil Court Clerk" as well as a copy of an envelope, addressed to him and postmarked January 31, 2020 that he asserts "was part of the attempt to file" a K.S.A. 60-1507 motion and "was denied by the Clerk[] and returned with a note, stating it was not correct." (Doc. 23-2, p. 1-2; Doc. 37-2.) The "Legal Postage Reversal" document does not identify what was mailed or reflect which district court was the recipient of the mailed item. (Doc. 37-2.) The envelope postmarked January 31, 2020 has no return address to indicate that it came from the Seward County District Court. Even liberally construed, this evidence provides only minimal support to Petitioner's claim that he attempted to file a K.S.A. 60-1507 motion in January 2020.[4]

Petitioner further explains that after his unsuccessful attempts in early 2020 to file a K.S.A. 60-1507 motion, he mailed family members a K.S.A. 60-1507 motion and a complaint seeking relief under 42 U.S.C. § 1983. (Doc. 21, p. 1.) In November 2020, Petitioner's brother took both pleadings to "the court clerk," whom Petitioner asserts refused to file the K.S.A. 60-1507 motion in Seward County District Court. *Id.* at 1-2. Petitioner asserts that this refusal is the type of circumstance that justifies equitable tolling. *Id.* But by the time Petitioner's brother attempted to file the K.S.A. 60-1507 motion in November 2020, the AEDPA statute of limitations already had expired, meaning that the attempt does not entitle Petitioner to equitable tolling. Even after careful

---

[4] Petitioner has also submitted a copy of an envelope addressed to him with a return address of the Seward County District Court, postmarked January 15, 2021, and marked received on January 19, 2020. (Doc. 23-1, p. 1-2.) Because an envelope generally is not marked "received" until after it has been mailed to a recipient, the Court presumes for purposes of this order that the discrepancy between the 2021 postmark and the stamped 2020 date of receipt was an error by the individual who marked the envelope received. This means that the envelope was mailed and received in 2021, which is outside the AEDPA statute of limitations and thus does not affect equitable tolling.

consideration of all of Petitioner's arguments and the evidence he has submitted to this Court, the Court concludes that Petitioner is not entitled to equitable tolling of the AEDPA statute of limitations.

*Actual Innocence Exception*

> As explained in the NOSC:
>
> > An exception to the AEDPA statute of limitations exists where a petitioner adequately asserts actual innocence. In federal court, "actual innocence 'serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or . . . expiration of the statute of limitations.'" *Fontenot v. Crow*, 4 F.4th 982, 1030 (10th Cir. 2021) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013)). "Actual innocence means 'factual innocence not mere legal insufficiency.'" *O'Bryant v. Oklahoma*, 568 Fed. Appx. 632, 637 (10th Cir. 2014) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)). This is because the actual innocence exception exists to provide an avenue to remedy "the conviction of one who is actually innocent." *Bousley*, 523 U.S. at 623-24.
> >
> > To benefit from the actual innocence exception to the federal habeas statute of limitations, Petitioner is not required to conclusively exonerate himself. *See Fontenot*, 4 F.4th at 1030. Rather, he must identify "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *See Schlup v. Delo*, 513 U.S. 298, 324 (1995). He "must establish that, in light of [this] new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House v. Bell* 547 U.S. 518, 536-37 (2006) (quoting *Schlup*, 513 U.S. at 327).

(Doc. 3, p. 6-7.)

To determine whether Petitioner has made a sufficiently credible showing of actual innocence to overcome the untimeliness of his petition, this Court

> must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial. Put another way, the innocence inquiry requires a holistic judgment about all the evidence[] and its likely effect on reasonable jurors applying the reasonable-doubt standard.

*See Fontenot*, 4 F.4th at 1031-32 (citations and internal quotation marks omitted).

The actual innocence standard is demanding and is not easy to meet. Only an extraordinary

9

case—in which there is "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error"—will justify application of the actual innocence exception. *Id.* at 1031 (citations and internal quotation marks omitted). "This exception 'is intended for those rare situations where the State has convicted the wrong person of the crime or where it is evident that the law has made a mistake.'" *Taylor v. Powell*, 7 F.4th 920, 926-27 (10th Cir. 2021) (citations omitted). Because the actual innocence exception is fact-based and requires a holistic consideration of the evidence, the Court will set forth the factual background of this matter as stated in the KCOA's 2018 opinion in Petitioner's direct appeal.[5]

> Abdifathah Hassan Hashi, the robbery victim, met Mohammad Jama, his friend and coworker, at a bar in Liberal shortly before midnight on Halloween in 2015. Hashi drank heavily until closing time about two hours later and became quite intoxicated. Jama abstained. While at the bar, Hashi exchanged text messages with Raeanne Winters, who he had met briefly sometime earlier. Winters worked as a dancer at a gentlemen's club across the state line in Oklahoma. Hashi arranged to rendezvous with Winters near the parking lot of a downtown bank.
>
> Jama drove Hashi to the location and waited in their car as Hashi approached Winters' sedan. According to the account Winters and Jenkins offered at trial, Hashi made an untoward sexual suggestion to Winters. Jenkins interceded, and he and Hashi quickly began exchanging punches. Jenkins knocked Hashi to the pavement. Hashi, however, described a friendly exchange with Winters. He said Jenkins suddenly attacked him for no reason. Although he tried to fend off Jenkins, he could not. Hashi retreated toward Jama and realized he was missing a bankroll of $400, his cell phone, and a debit card his employer issued to him. As Hashi got into the car with Jama, Winters' sedan passed by them. They decided to give chase. While Jama pursued the sedan, Hashi called 911 to report he had been robbed and provided a description of the sedan, Winters, and Jenkins.
>
> After receiving the report of a possible robbery, Liberal Police Sergeant Dallas Ryan saw Winters' sedan heading away from the vicinity of the bank. He immediately initiated a felony traffic stop. Sgt. Ryan ordered Winters and Jenkins out of the sedan, and upon seeing they matched the description of the persons involved in the robbery, he placed them under arrest. Sgt. Ryan then had a communications specialist call Hashi's cell phone. A phone on the driver's side floorboard of the sedan began ringing. Sgt. Ryan recovered the cell phone. Hashi

---

[5] These facts are included here solely to provide context for Petitioner's arguments.

10

later identified the phone as his. He told the officers investigating the robbery that the face of the phone had not been cracked before it was taken from him. Ryan also recovered a makeup case from the sedan. The case contained about $345 in cash in one compartment and about $120 in cash in a second compartment. Hashi's debit card never turned up. After Winters and Jenkins were arrested, officers advised them of their *Miranda* rights and attempted to question them about the incident. Winters and Jenkins both invoked their constitutional right to remain silent and declined to answer questions.

In a videotaped statement taken shortly after the events, Hashi outlined for investigators what happened. He identified his passport and a set of keys as among the items taken from him, although he later found them at home. He also at least implied the face of the cell phone was cracked before the robbery, an implication inconsistent with his earlier account.

The jury heard the case during two days in early August 2016. Hashi, Jama, and Sgt. Ryan testified for the State, along with other witnesses. The jury also watched Hashi's videotaped statement. At trial, Winters and Jenkins testified as defense witnesses. Winters told the jury she had earned the money in the makeup case working at a club earlier that night. She also explained she saw Hashi's cell phone on the pavement immediately after the fight and picked it up because she thought it belonged to Jenkins. Jenkins testified that he perceived Hashi as being threatening toward Winters and sought to calm things down. But Hashi didn't back away and appeared to be drunk. According to Jenkins, the two of them wound up throwing punches. Jenkins denied taking money or anything else from Hashi.

There were a number of discrepancies across the various accounts of what happened between Hashi and Jenkins. Those differences were for the jury to sort out, and we have no need to catalogue them here. See *Golden v. Den-Mat Corp.*, 47 Kan. App. 2d 450, 465, 276 P.3d 773 (2012) ("Jurors sort out varied facts and their implications at trial."); *State v. Bellinger*, 47 Kan. App. 2d 776, 807, 278 P.3d 975 (2012) (Atcheson, J., dissenting). But we mention in passing Dekow Omar, a friend of Hashi's, who testified as a defense witness. He claimed to have been with Hashi and Jama at the bar and when they drove to the encounter with Winters. Neither Hashi nor Jama mentioned being with Omar. According to Omar, the three men believed they were headed for an assignation with Winters. When she then objected, Jenkins intervened. Omar testified that he never saw Jenkins take anything from Hashi and that he had seen damage to the face of Hashi's cell phone before that night.

*Jenkins I*, 2018 WL 2375788 at *1-2.

To the extent that Petitioner now argues to this Court that he is "actually innocent because of the many legal deficiencies and insufficiencies" during his state-court proceedings, his

11

arguments must fail. (*See* Doc. 19-1, p. 5.) As explained in the NOSC, in the context of bypassing the federal habeas statute of limitations, "[a]ctual innocence means 'factual innocence not mere legal insufficiency.'" *O'Bryant*, 568 Fed. Appx. at 637 (quoting *Bousley*, 523 U.S. at 623).

Petitioner also argues that he is "factually innocent" because, although the complaint alleged that the crimes in question were committed on October 31, 2015, Mr. Hashi and Mr. Jama stated that the events occurred on November 1, 2015, by which time Petitioner "had been in the Seward County Jail for over 24 hours." (Doc. 19-1, p. 5.) As set forth above, a successful actual innocence argument requires Petitioner to present "new reliable evidence." "To be 'new,' the evidence need only be evidence that was not considered by the fact-finder in the original proceedings." *Taylor*, 7 F.4th at 927 (citing *Fontenot*, 4 F.4th at 1031-33). But the conflicting information about the date on which the crimes occurred was information that was before the jury during trial.[6] Thus, it is not "new" evidence and it cannot be the basis for allowing Petitioner to pass through the actual innocence gateway.

When his filings are liberally construed, Petitioner identifies the following "new evidence" he believes satisfies the actual innocence standard: (1) a "video of [Mr.] Hashi smoking a blunt"; (2) ATM transaction records or other records that show the serial numbers of cash Mr. Hashi allegedly withdrew from an ATM on the night in question; (3) testimony from Robert Long; and (4) evidence related to Mr. Hashi's and Petitioner's cell phones, particularly that their cell phones were identical and that Mr. Hashi bought his cell phone from Mr. Omar, who had stolen it from a third party and been convicted of that theft. In the PAR, Respondent argues that Petitioner's claim

---

[6] The state district court instructed the jury both at the beginning of the trial and just before closing arguments that the State had charged Petitioner with aggravated robbery occurring "on or about the 31st day of October, 2015" (Doc. 35-15, p. 92; 35-16, p. 180.) During his initial testimony, Mr. Hashi described events that occurred on October 31, 2015. (Doc. 25-16, p. 189-90.) But during cross-examination, Mr. Hashi agreed that October 31, 2015 was a Saturday and that the events occurred at "3:00 in the morning on a Saturday night," meaning that they occurred on November 1, 2015. *Id.* at 205-06.

to the actual innocence exception is "entirely speculative," pointing out that Petitioner has failed to provide this Court with any evidence. (Doc. 28, p. 6.)

Respondent's argument is well-taken. *See Taylor*, 7 F.4th at 927 ("An actual innocence claim must be based on more than the petitioner's speculations and conjectures."). Petitioner has not provided the Court with any of the new evidence on which he bases his arguments. He has not presented any video evidence, any financial records, a sworn statement by Mr. Long, a picture of Petitioner's cell phone or other evidence showing its similarity to Mr. Hashi's cell phone, or any evidence that Mr. Hashi's cell phone had been purchased from Mr. Omar after Mr. Omar stole it. Rather, he merely describes this evidence and what he anticipates it would or could show.

This type of speculative argument does not sufficiently support allowing Petitioner through the actual innocence gateway. The Tenth Circuit has made clear that "tenable actual-innocence gateway pleas are rare, arising only in an extraordinary case" when there is "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Fontenot*, 4 F. 4th at 1031 (citations and quotation marks omitted). Simply put, it is not enough for Petitioner to describe evidence that, *if it exists*, could create reasonable doubt in the mind of a reasonable juror. He must present the evidence to the Court.

Because Petitioner has only described—and not provided—the evidence he claims would show actual innocence, the Court cannot conclude that the evidence is reliable or accurately determine the impact it would have on a reasonable juror. *See Donaldson v. Langford*, 2025 WL 1664004, *7 (D. Kan. June 12, 2025) (unpublished) (holding that it was insufficient, in an actual innocence analysis, to depend on a handwritten narrative that was not provided to the Court); *see, e.g.*, *Scott v. Bridges*, 2023 WL 5016642, *11 (E.D. Okla. Aug. 7, 2023) (unpublished opinion and

13

order) (finding documents referred to but not presented were not reliable evidence). Moreover, allowing purely speculative arguments such as Petitioner's to succeed would unacceptably expand the actual innocence gateway to allow passage to any federal habeas petitioner who could conceive of evidence that, if it exists, would have swayed the jury at his or her trial.

As a final note, the Court will address Petitioner's unsupported claim that financial records, either from the ATM at which Mr. Hashi testified he withdrew the money taken from him or what Petitioner calls "tracking" data from the FDIC, would show that Mr. Hashi either did not withdraw any money on the night in question or that the serial numbers on money he withdrew did not match the serial numbers on the money found in the car with Petitioner and Ms. Winters. (Doc. 21, p. 7; Doc. 23, p. 19.) Petitioner's allegations that his former attorney obtained these records, but declined to give them to Petitioner upon request, instead closing his law practice and moving out of state are troubling. (*See* Doc. 21, p. 7, Doc. 37, p. 1.) But Petitioner has not supported these allegations with any evidence, such as a copy of the letter in which he alleges he requested the records from counsel but which was returned to him as undeliverable. (*See* Doc. 21, p. 7.) Nor does it appear that Petitioner has actually seen the records in question, so his representations of their content is no more than speculation. As noted above, speculation and conjecture are not sufficient to pass through the actual innocence gateway.

In summary, the Court has carefully considered all of Petitioner's arguments and has reviewed the state-court records before it, including the trial transcripts. Although Petitioner describes evidence that he believes could be produced and that he believes would leave no reasonable juror able to convict him of aggravated robbery, he has not submitted to this Court any such evidence. Thus, the Court cannot conclude that Petitioner has presented new, reliable evidence that makes it more likely than not that no reasonable juror would have found him guilty

of aggravated robbery. Petitioner has failed to satisfy the high standard required to proceed through the actual innocence gateway and, because he has also failed to show that he is entitled to equitable tolling of the federal habeas statute of limitations, this matter must be dismissed as untimely filed.

### Certificate of Appealability

Rule 11 of the Rules Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability (COA) upon entering a final adverse order. A COA may issue only if the petitioner made a substantial showing of the denial of a constitutional rights. 28 U.S.C. § 2253(c)(2).

> "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The failure to satisfy either prong requires the denial of a COA. *Id.* at 485. The Court concludes that the procedural ruling in this matter is not subject to debate among jurists of reason. Therefore, the Court declines to issue a certificate of appealability.

**IT IS THEREFORE ORDERED THAT** this matter is dismissed with prejudice as time-barred. No certificate of appealability will issue.

**IT IS SO ORDERED.**

DATED:  This 14th day of January, 2026, at Kansas City, Kansas.

S/ John W. Lungstrum  
JOHN W. LUNGSTRUM  
United States District Judge